[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-11648
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 09, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00295-CV-W-S

WENDY A. DAVIS,

Plaintiff-Appellant,

versus

MICHAEL J. ASTRUE, Commissioner of Social
Security,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(July 9, 2008)**

Before BIRCH, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Wendy Davis appeals the district court's order affirming the Social Security

Administration's denial of her application for disability insurance benefits, pursuant to 42 U.S.C. § 405(g). Davis raises two issues on appeal. First, whether the Administrative Law Judge ("ALJ"), erred in giving "no weight" to Davis's treating physicians' opinions. Second, whether the ALJ erred by failing to properly consider Davis's subjective complaints and non-exertional impairments. After a careful review of the record, we conclude that the ALJ's reasons for discrediting both the opinions of the treating physicians and Davis's testimony as to her pain, are not supported by substantial evidence. Accordingly, we VACATE and REMAND.

## I. BACKGROUND

Davis filed an application for disability insurance benefits alleging that she had been unable to work since June 2003. The Commissioner denied Davis's application initially and upon reconsideration. Davis filed a request for a hearing before an ALJ. At the hearing, Davis testified and presented documentary evidence, the bulk of which was already in the administrative record. The vocational expert ("VE") also testified at the hearing. R.Exhs. at 330. To the ALJ's hypothetical question regarding a "younger individual" with Davis's education, work history, and similar physical restrictions, the VE testified that such a hypothetical person would not be able to do any of the past work performed

2

by Davis. Id. at 332. To the ALJ's inquiry into whether such a hypothetical person could perform occupations that exist in the national economy, the VE testified that he would advance the position of marker or pricer. Id. at 332-33. He stated that this job had a "light exertional level, SVP of two, which is simple, routine, non interfering, three step work activity." Id. at 333. He testified that the second position he would advance was that of garment sorter, which was also at the light exertional level, SVP of two, and which was unskilled, entry-level work. Id. The ALJ then asked the VE whether he had heard Davis's testimony; the VE responded that he had. Id. The ALJ asked whether those same two positions would be available to Davis if the ALJ found credible her testimony that she had severe problems with concentration, severe pain on a regular basis, required much time lying down, and suffered depression and anxiety. Id. at 333-34. The VE responded that if that were the case, Davis would not be able to function in either of the two named jobs. Id. at 334. He stated that in his opinion, Davis "wouldn't be able to function on any job on a sustained basis in the competitive labor market." Id. The ALJ then inquired whether a restriction on walking more than 10 minutes at a time, plus the initially-named restrictions, would impact one's ability to perform those same two jobs, and the VE responded yes. Id.

The ALJ denied Davis benefits. Id. at 12-24. The ALJ first found that

3

Davis's earnings after the onset of her medical conditions did not constitute substantial gainful activity. Id. at 16. Next, the ALJ examined the severity of Davis's combination of impairments, finding that her asthma was "under good control with medication and not a severe impairment." Id. at 17. He found that the medical evidence indicated that Davis had fibromyalgia, major depressive disorder, personality disorder, generalized anxiety disorder, and degenerative disc disease, "impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Id. at 17 (internal quotations omitted).

The ALJ stated that the evidence showed that Davis had only mild restrictions in activities of daily living, citing the questionnaire she filled out in which she indicated that she had no problems caring for her personal needs, that she was able to cook and clean, and that she could pick her daughter up from school. Id. at 18. He stated that Davis had moderate difficulty in social functioning, as she reported that she does not want to go anywhere, but that she generally gets along well with people. Id. He stated that Davis had moderate difficulties in maintaining concentration, persistence, or pace, as she reported having problems concentrating and remembering, though David Ghostley, a

4

clinical psychologist, had noted that her concentration was unimpaired.  Id.

Finally, the ALJ stated that there was no evidence that Davis had experienced an episode of decompensation since her alleged onset date.  Id.

The ALJ found that, "[b]ased on the objective findings and inconsistencies," Davis's testimony of experiencing extreme pain which kept her from being able to sit, stand, or walk for prolonged periods, or care for her personal hygiene needs, was not credible.  Id. at 18-19.  Specifically, the ALJ pointed to the inconsistency of Davis's statement in the questionnaire, that she was able to care for her personal needs, and her statement at the hearing that she sometimes had to have her husband wash her hair and that she goes days without taking a bath.  Id. at 19.

In considering the medical opinions of Davis's treating physicians, the ALJ stated that he gave no weight to Dr. Edmund LaCour's 10 March 2004 physical assessment of Davis, in which Dr. LaCour found severe restrictions on Davis's ability to sit, stand, or walk for long periods of time, as well as restrictions on her ability to do such things as push, pull, bend, and crawl.  Id.  The ALJ found that Dr. LaCour's assessment was "too extreme and not supported by the objective findings of record."  Id. at 19.  The ALJ then considered Dr. LaCour's 7 October 2004, assessment, in which Dr. LaCour stated that Davis might be able to work on a part-time basis, if the job was not physically demanding or particularly stressful.

Id. The ALJ rejected Dr. LaCour's opinion, stating that the evidence supported the conclusion that she had a greater residual functional capacity ("RFC") than Dr. LaCour indicated. Id.

The ALJ then considered Davis's psychological complaints, stating that the evidence revealed that Davis was not credible. Id. He stated that Davis's daily living activities and history of conservative treatment did not support her extreme allegations, citing Davis's statements that she picks her daughter up from school, cooks, and performs light cleaning. Id. He noted that the record showed that Davis denied experiencing any side-effects from her medications. Id.

The ALJ also considered the medical opinion of Dr. Ghostley, which was given after a consultative psychological evaluation on 17 May 2004. Id. He gave "significant weight" to Dr. Ghostley's opinion that Davis's "ability to understand and remember instructions, as well as to respond appropriately to supervisors, co-workers, and work pressures in a work setting", was impaired. Id. However, the ALJ found that, although Davis did have some limitations, she was "not as limited as alleged." Id.

The ALJ next considered the 20 May 2004 assessment by Nelson Handal, M.D., and stated that he rejected Dr. Handal's opinion that Davis had a global assessment functioning level ("GAF") level of 50. Id. at 19-20. The ALJ found

6

that this assessment was not supported by Dr. Handal's subsequent treatment records, and that the evidence revealed that Dr. Handal had noted on 10 September 2004 that Davis was "functioning 'fair.'" Id. at 20. The ALJ found that the evidence showed that Dr. LaCour had noted on 6 December 2004 that Davis had not seen Dr. Handal in several months, and that Dr. Handal's 17 January 2005 assessment was inconsistent, as Dr. Handal reported that Davis was functioning "fair," and yet found her condition to be "worse." Id. The ALJ also stated that a treatment note by Dr. Handal, dated 30 June 2005, revealed that Davis was found to be functioning fair, that Dr. Handal had assessed her condition as "overall improved," though Dr. Handal continued to find her GAF level was 50. Id. The ALJ stated, he gave "no weight to Dr. Handal's opinion that [Davis]'s global assessment level was 50 as it is totally inconsistent with his treatment records." Id. Further, the ALJ found that Davis's treatment by Dr. Handal was sporadic, and that Dr. Handal continued to assess Davis a GAF of 50, though his treatment records revealed that she was denying feelings of depression and anxiety. Id.

The ALJ then turned to the state agency physical residual functional capacity assessment form, to which he stated he gave no weight, since it was not signed or dated. Id. He noted, however, that he found the opinions in the assessment to be consistent with the record evidence. Id.; see also, id. at 142-49. The ALJ also

7

considered the state agency psychiatric review technique form, which was completed by a state medical consultant. Id. at 20. The medical consultant found that Davis had mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. See id. at 218-31. The ALJ found that Davis had moderate limitations in social functioning, though he stated that the evidence supported the conclusion that Davis was not as limited as alleged. Id. at 20.

The ALJ found that Davis had the RFC to lift or carry 20 pounds occasionally and 10 pounds frequently, that she could occasionally push or pull with her lower extremities, that she could never climb ladders, ropes, or scaffolds, and that she could never kneel or crawl. Id. Further, Davis could occasionally climb ramps and stairs, balance, stoop and crouch, as well as occasionally reach overhead with her arms. Id. He found that she must avoid concentrated exposure to extreme cold and heat, and avoid all exposure to heights and dangerous machinery. Id. at 20-21. Finally, the ALJ stated, that due to Davis's pain and emotional problems, she could only concentrate on simple, routine, unskilled work, that she could not perform quota or piece rate work, that she must avoid large crowds in the workplace, and that she could not wait on public customers, either

face-to-face or over the telephone.  Id. at 21.

Next, the ALJ found that Davis could not perform any of her past relevant work, but that she was capable of performing a significant range of light work as defined in 20 CFR § 404.1567.  Id.  Based on the VE's testimony, Davis could perform marker/pricer and garment sorter jobs.  Id. at 22.  The Appeals Council denied review.  Id. at 4, 1D.  The district court affirmed.  R1-20.

## II.  DISCUSSION

We review a Social Security determination to ascertain whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied.  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam).  Substantial evidence is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).  Under this limited standard of review, we will not decide the facts anew, make credibility determinations, or re-weigh the evidence.  Moore, 405 F.3d at 1211.  Further, on review, there is no presumption "that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that legal conclusions reached were valid.  Instead, we conduct an exacting examination of these factors."  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam) (internal quotation and citation omitted).

In evaluating a claim for disability benefits, an ALJ must evaluate the claimant's case with respect to the following five criteria, as set forth in 20 C.F.R. § 404.1520: "1. [i]s the individual performing substantial gainful activity; 2 [d]oes she have a severe impairment; 3 [d]oes she have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4 [c]an she perform her past relevant work; and 5 [b]ased on her age, education, and work experience, can she perform other work of the sort found in the national economy. Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). At the fourth and fifth steps, a determination of the claimant's residual functional capacity ("RFC"), is made by the ALJ by considering the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, crouch, and other work-related physical demands. See 20 C.F.R. §§ 404.1520(e), (f), 404.1545(b).

A.  Whether the ALJ erred in giving "no weight" to Davis's treating physicians' opinions

Davis argues that the ALJ erred in giving "no weight" to the opinions of two treating physicians without showing "good cause." Davis asserts that the record of her treatment by her rheumatologist, Dr. LaCour, demonstrates that (1) her condition was worsening; (2) her medications were routinely increased; (3) she had lengthy and repeated absences from work; and (4) Dr. LaCour's treatment notes were entirely consistent with both his treatment plan and Davis's restrictions.

10

Further, Davis contends that the ALJ misread the record of her treatment by her psychiatrist, Dr. Handal, when he found that Dr. Handal had found Davis to be doing "fair" at several of her visits. Davis submits that the assessment of "fair," relied on by the ALJ, was Davis's own assessment of her health, not Dr. Handal's, as his medical notes began, "Patient is reportedly. . . ," rather than stating Dr. Handal's own assessment. Davis asserts that Dr. Handal's treatment demonstrates that he clearly did not agree with her own assessment that she was doing fair, as he repeatedly changed her medications and increased her dosages. Finally, Davis argues that in order for the ALJ to give a treating physician's opinion no weight, the ALJ had to consider the factors laid out in Phillips, 357 F.3d at 1240-41. She contends that it was an error of law for the ALJ to give the only medical opinions in the case "no weight," because each physician is board certified in their respective specialties, Davis had been treated by Dr. LaCour for over two years and by Dr. Handal for 15 months at the time of the hearing, as she had numerous visits with each doctor, and as each doctor had substantially the same opinion regarding Davis's ability to perform in a work environment. Since the only medical evidence contradicting her physicians' opinions is an unsigned and undated opinion of an agency employee, Davis contends that the ALJ had no medical evidence to support the RFC he used for her, and that the unsigned opinion cannot be viewed as

11

substantial evidence that can overcome the opinions and medical evidence of her two treating physicians.

Social Security regulations provide guidelines for the ALJ to use when evaluating medical opinion evidence. See 20 C.F.R. § 404.1527. The ALJ considers many factors when weighing medical opinions, including the examining relationship, the treatment relationship, how supported an opinion is, whether an opinion is consistent with the record, and a doctor's specialization. 20 C.F.R. § 404.1527(d)(1)-(6). In Social Security disability benefits cases, generally, the opinions of examining physicians are given more weight than non-examining physicians, treating physicians are given more weight than non-treating physicians, and specialists are given more weight on issues within their areas of expertise than non-specialists. See 20 C.F.R. § 404.1527(d)(1), (2), (5). When the ALJ does not give the treating source's opinion controlling weight, the ALJ applies other factors such as the length of treatment, the frequency of examination, the nature and extent of the relationship, as well as the supportability of the opinion, its consistency with other evidence, and the specialization of the physician. See 20 C.F.R. § 404.1527(d)(2)-(6).

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Phillips, 357

F.3d at 1240 (quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted).  Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips, 357 F.3d at 1241.  Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error.  Moore, 405 F.3d at 1212.

Here, the ALJ improperly gave "no weight" to the medical opinion of Dr. LaCour.  First, Dr. LaCour and Davis had a longstanding relationship in which Dr. LaCour was her treating physician for nearly two years.  See R.Exhs. at 212, 298-99.  Moreover, Dr. LaCour saw Davis on a fairly frequent basis, having seen her at least 15 times between her onset date of 1 June 2003, and April 2005, and communicating with her regularly.  See id. at 212-299.

In examining Dr. LaCour's medical opinion, the ALJ first discredited Davis's testimony regarding her extreme limitations based on the objective findings and the inconsistency between her testimony and her response to a question on the daily activities questionnaire.  Id. at 19.  He found that the progress notes from Dr. LaCour indicated that Davis had reported feeling better, that she

13

refused trigger injections, and that by April 2005, she was "overall improved." Id..

In light of these findings, the ALJ stated that the 10 March 2004, assessment by Dr.

LaCour was "too extreme and not supported by the objective findings of record."

Id. However, an examination of the specific inconsistencies cited by the ALJ, as

well as the objective findings of record, demonstrates that the substantial record

evidence does not support his conclusion to give Dr. LaCour's medical opinion "no

weight."

In the daily activities questionnaire, Davis stated, in part, that she was able

to care for her personal needs on a regular basis without assistance, that her family

helped to take care of her, that she "sometimes" cooked, and that her daughter and

husband did the shopping for her. Id. at 117-18. She also stated that she had

"good days" and "bad days," noting that on a good day, she was capable of

performing light dusting and cleaning in the kitchen, and on a bad day, she would

lay in bed. Id. at 118. While the ALJ found these statements inconsistent with

Davis's testimony that her husband sometimes had to wash her hair and that she

would go days without taking a bath, it should be noted that Davis filled out the

questionnaire over a year prior to giving testimony at the hearing. See id. at 324-

25. Within a period of many months following 6 April 2004, the day on which

Davis completed the questionnaire, Davis was again given a work excuse by Dr.

LaCour, she reported that she was not functioning well at home, Dr. LaCour increased her medication due to the pain she was experiencing, and he found that her fibromyalgia pain had increased "all over." Id. at 273, 291, 294, 301. Davis's testimony that her husband sometimes had to wash her hair, and her response to the questionnaire, that she was capable of caring for her own personal needs, do appear to contradict each other when viewed in isolation. Id. at 117, 324-25. However, when that testimony is viewed in light of the questionnaire as a whole, where Davis stated that her family helped to care for her, and that she had good days and bad days, her statement that her husband "sometimes" had to wash her hair, appears entirely consistent. Id. These statements alone do not provide the substantial evidence required to support the ALJ's reasons for giving Dr. LaCour's opinion "no weight."

The ALJ also examined Davis's testimony in light of her medical history and Dr. LaCour's progress notes in deciding to give Dr. LaCour's opinion "no weight." Id. at 19. The ALJ found that Davis's testimony of experiencing extreme pain was inconsistent with several progress notes completed by Dr. LaCour between 2003 and 2005. Id. Specifically, the ALJ looked at the 19 June 2003 and 1 December 2003 progress notes, where Davis had reported overall improvement and decreased pain. Id. He also noted that on 6 December 2004, Davis refused

15

trigger injections, opting instead to use Lidoderm patches.  Id.  Finally, the ALJ noted that on 7 April 2005, Dr. LaCour indicated that Davis's fibromyalgia was improved since starting Cymbalta.  Id.  The ALJ found that this evidence was inconsistent with both Davis's testimony and Dr. LaCour's 10 March 2004, physical assessment of Davis, where he stated that she could not sit for six to eight hours in an eight-hour workday, that she could not stand or walk for six hours in an eight-hour workday, that she could lift 10-20 pounds, but only 10 pounds repetitively, and that she could not push or pull with arm or foot controls, bend, squat, crawl and climb.  Id.  The ALJ stated that Dr. LaCour's assessment was "too extreme and not supported by the objective findings of record."  Id.

However, while the objective findings of record demonstrate that Davis did have periods of overall improvement between 2003 and 2005, she also had many more periods where her condition remained stable or became worse.  On 19 June 2003, the date cited by the ALJ for Davis's improvement, Davis complained to Kenneth Roberts, M.D., the company doctor, that her knees were aching and her feet were swelling.  Id. at 181.  On 24 June 2003, Davis was excused from work until 10 July 2003 by Dr. Roberts, M.D., who also referred her to a rheumatologist, Dr. LaCour.  Id. at 180, 212.  On 9 July 2003, Dr. LaCour's objective findings showed that Davis's soft tissue was notable for "1+ tenderness in all 18

16

fibromyalgia tender points," and on 23 July 2003, Davis received a work excuse through September 9, 2003. Id. at 213. On 9 September 2003, Davis was found to have 1-2+ tenderness, and on 12 September 2003, she described her pain as a ten on a scale of one to ten. Id. at 254. Further, on 16 September 2003, Davis had increased pain in her neck and shoulders, and Dr. LaCour's objective findings showed "[s]ignificant tenderness 2-3+ in the paracervical, paralumbar area." Id. at 210. The record has many more such examples where Davis's condition worsened or simply failed to improve. See id. at 245, 175, 209, 197, 239, 208, 207, 205, 238. Specifically, within the weeks before Dr. LaCour completed the 10 March 2004, physical assessment rejected by the ALJ as too extreme, Dr. LaCour's objective findings show that Davis's fibromyalgia was "very symptomatic, quite a bit of tenderness," and that she had "at least 1-2+ tenderness on soft tissue palpitation." Id. at 205, 208. Further, Dr. LaCour's assessment shows that Davis was experiencing debilitating symptoms and missing much work because of it. Id. at 205. In fact, on 10 March 2004, the day on which Dr. LaCour completed the physical assessment of Davis, Davis was out of work with a work excuse until 2 April 2004. Id. Moreover, while the ALJ cited Davis's refusal of trigger injections on 6 December 2004 as evidence that her treatment was conservative, the record shows that Davis did in fact opt for the injections at other points in time, as Dr.

17

LaCour noted on 13 August 2004 that the injections were helping with Davis's pain. Id. at 291. The periods of improvement cited by the ALJ, taken in conjunction with the periods of increased pain and debilitation, are consistent with Davis's statements that she experienced good days and bad days, both within the questionnaire and in her testimony. Id. at 118, 328. They are also consistent with Dr. LaCour's 10 March 2004 physical assessment. Again, substantial evidence does not support the ALJ's conclusion that the objective findings of record did not support Dr. LaCour's medical opinion.

The ALJ also rejected Dr. LaCour's 7 October 2004 medical opinion that Davis might be able to work part-time, assuming the job was not physically demanding and not particularly stressful. Id. at 289. The ALJ found that this opinion was not supported by the record, stating that the evidence supported the conclusion that Davis's RFC allowed her to perform at the level of light exertion. Id. at 19. However, the record evidence shows that Davis was on leave from work from 23 June 2004 through 9 August 2004. Id. at 294. It also shows that two months prior to Dr. LaCour's October assessment, on 13 August 2004, Dr. LaCour noted that he had increased Davis's medications because of the pain she was experiencing. Id. at 291. The record also reflects that at various points throughout 2004, both Dr. LaCour and Davis's physical therapist remarked that Davis's

18

muscle pain was aggravated by increased work, and that her pain decreased when she was on medical leave. Id. at 239, 294. Further, following the medical opinion given in October, Davis continued to experience increased pain from her fibromyalgia upon her return to part-time work. Id. at 301. Dr. LaCour's 6 December 2004 physical examination of Davis showed that she had tenderness in 14 of the 18 fibromyalgia tender points, and that her knees were especially tender. Id. at 302. Again, the substantial record evidence does not support the ALJ's conclusion that Dr. LaCour's medical opinion should be given "no weight," as the evidence demonstrates that Dr. LaCour's objective findings are consistent with his October 2004 opinion.

Regarding the ALJ's decision that "no weight" be given to Dr. Handal's medical opinion, the ALJ first concluded that Davis was not credible as to her psychological complaints. Id. at 19. The ALJ explained his conclusion by citing the "Daily Activities Questionnaire" completed by Davis, stating, that she reported that she picks her daughter up from school every day, cooks, and performs light cleaning, as well as noting that she generally gets along with most people. Id. at 19, 118-19. The ALJ also noted Davis's history of conservative treatment and her denial of experiencing side-effects from her medications. Id. at 119.

While we will not make credibility determinations or re-weigh the evidence,

it is useful to examine statements made by Davis, because the ALJ relied in part on Davis's own assertions in determining that Dr. Handal's medical opinion should be given "no weight." See Moore, 405 F.3d at 1211. While the ALJ cited Davis's responses to the "Daily Activities Questionnaire," completed in April 2004, in finding her "extreme allegations" not credible, the record evidence demonstrates that Davis's responses to the questionnaire did not contradict her later statements. Id. at 19. Specifically, when Davis was asked in the questionnaire how often she left her house, she responded, "I pick up my daughter from school and go to the doctor." Id. at 118. Regarding Davis's ability to perform household chores, Davis stated in the questionnaire, "sometimes, I cook[,] if not[,] my husband brings home food or we just eat sandwiches." Id. She also stated, "If I am having a good day I can do light dusting and clean the kitchen." Id. Davis noted, "[everything] that [I do] just depends on if I am having a good day," and "I lay in bed if I am having a bad day. If [I'm having a] good day I try to work around the house," and "I have to take several breaks in order for me to complete tasks on a good day." Id. at 119-20. Davis further stated that her daughter and husband did the shopping for her, and that while she used to balance the checkbook, she no longer did because she could not handle the anxiety and details of the task. Id. at 118, 120. While Davis stated, and the ALJ cited, that she gets along well with most people, when asked

20

about her social activity, Davis stated that a friend came to see her several times a week, but that she did not participate in social activities due to the pain she experienced, and that she did not want to go anywhere and simply stayed home because of the pain. Id. at 119.

While the ALJ cited several of these statements to show that Davis was more capable than she later testified, these statements do not directly contradict her later statements. Id. at 19. First, Davis did not state on the questionnaire that she picked her daughter up "everyday," as the ALJ stated. Id. at 119, 19. When asked how often she left the house, she replied that she did so to go to the doctor and to pick her daughter up. Id. at 19. At the hearing, Davis asserted that she slept a lot because of feelings of sadness, that she had stopped cooking, though she might do so on a good day, and that she stopped going to the grocery store. Id. at 323-24, 328. While these statements may expand on some of her earlier statements, none of them works to contradict them. Moreover, it should be noted that the questionnaire was completed by Davis prior to her first session with Dr. Handal, and nearly a year and a half prior to the hearing. See id. at 284; 309.

Further, Davis's responses to the questionnaire are not inconsistent with the objective findings of Dr. Handal. Specifically, Dr. Handal diagnosed Davis as having major depressive disorder, generalized anxiety disorder, panic disorder with

21

agoraphobia, and restless leg syndrome. Id. at 286. Davis's statements on the questionnaire, that she did not like to leave her house, and that she no longer balanced the checkbook because of the anxiety it caused her, are consistent with Dr. Handal's diagnosis. Id. at 120.

Moreover, while the ALJ stated that Davis's history of conservative treatment failed to support her psychological complaints, the record evidence shows that Davis was on several medications for depression, anxiety, and mood stability, that she switched medications to better address her problems, and that she had her dosages increased on several occasions. See id. at 274, 276, 278, 279, 282, 287. With regard to the ALJ's statement that Davis did not complain about side-effects from her medications to Dr. Handal, it is true that Davis repeatedly "denied adverse events or serious side[-]effects." See id. at 279, 281. However, Davis did report to Dr. Handal that she was experiencing "poor concentration, difficulty following directions, jumps tasks and does not complete assignments." Id. at 281. She further reported that she was experiencing a lack of motivation, stating she had only cooked two meals since her last visit with Dr. Handal, and that she was very forgetful and had difficulty focusing even when attempting to carry on a conversation, stating, "I get lost and I feel so dumb." Id. After hearing her complaints, Dr. Handal noted his recommendation that Davis hold off on taking

22

one of her medications for two days, to see if her memory would improve.  Id. at 282.  Furthermore, when asked at the hearing whether she experienced side-effects from her medications, Davis stated, "I have severe memory problems.  I can't concentrate, I'm afraid to drive anymore."  Id. at 319.

Following his finding that Davis was not credible, the ALJ rejected Dr. Handal's 20 May 2004 assessment that found Davis to have a GAF of 50.  Id. at 19.  The ALJ stated that he rejected this opinion because is was not supported by Dr. Handal's subsequent treatment records.  Id. at 20.  Specifically, the ALJ pointed to Dr. Handal's 10 September 2004 progress note stating that Dr. Handal found that Davis was functioning "fair."  Id.; see id. at 271.  He also pointed to Dr. Handal's 17 January 2005 progress note, stating that Dr. Handal had opined that Davis's functioning was fair, but assessed that her condition was worse, while also noting that Davis was "cooperative, alert and in no acute distress."  Id. at 20; see id. at 296.  The ALJ also pointed to Dr. Handal's 22 February 2005 progress note, stating that Dr. Handal again noted that Davis was functioning fair, that Davis reported eating good and sleeping fair, but that Davis's condition was worse.  Id. at 20; see id. at 307.  The ALJ then addressed the 30 June 2005 progress note, stating that the note revealed that Dr. Handal found Davis to be functioning fair, that he indicated that her condition was overall improved, but that he again gave Davis a

23

GAF level of 50. Id. at 20; see id. at 305. The ALJ gave "no weight" to Dr.

Handal's opinion that Davis had a GAF of 50, finding that "it is totally inconsistent

with the treatment records." Id. at 20. He further stated that the 30 June 2005

progress note indicated that Davis denied feelings of depression and was content

with her treatment, yet Dr. Handal continued to find her GAF to be 50. Id.; see id.

at 305. The ALJ also stated that Davis's treatment by Dr. Handal was sporadic,

citing a statement made by Dr. LaCour that Davis had not seen Dr. Handal in

months. Id. at 20; see id. at 301.

First, as to Dr. Handal's progress note dated 10 September 2004, Dr. Handal

noted, "Reportedly, patient is functioning fair. The patient is reportedly eating fair

and sleeping fair." Id. at 271. These statements were not Dr. Handal's assessment

of how Davis was functioning, as asserted by the ALJ, but rather were Davis's own

assessment of how she was functioning. Dr. Handal wrote under the section of the

note titled "Assessment," that Davis was "mildly improved." Id. Second, on the

progress note dated 17 January 2005, Dr. Handal again noted, "Reportedly, patient

is functioning fair. The patient is reportedly eating 'back and forth' and sleeping

fair." Id. at 296. He further quoted Davis's own statement that she was really

unhappy and isolating herself from her family. Id. Again, while the ALJ stated

that these statements reflected the findings of Dr. Handal, which contradicted his

24

assessment that Davis's condition was worse, they were actually statements of Davis's own self-assessment. Dr. Handal noted that Davis reported to him that she had been crying a lot and was depressed, and that she had tried to go back to work but had quit. Id. Dr. Handal then noted his own assessment, which was that Davis was doing worse at the present time. Id. Third, Dr. Handal's progress note, dated 22 February 2005, states, "Reportedly, patient is functioning fair. The patient is reportedly eating good and sleeping fair." Id. at 307. Again, this assessment was Davis's, not Dr. Handal's. Dr. Handal then noted that Davis reported that she had done well on Cymbalta, but that since the medication ran out, she had been crying and had not wanted to leave her house. Further, she reported that she had started a part-time job and that she was "absolutely miserable," "tired of all this crap and doing this to my family." Id. Dr. Handal then noted his assessment that Davis was doing worse. Id. Fourth, the progress note dated 30 June 2005, stated, "Reportedly, patient is functioning fair. The patient is reportedly eating good and sleeping fair with the Trazodone." Id. at 305. These statements were Davis's own assessment of her condition. Davis then reported that her mood was improved and that she had not suffered any panic attacks. She also reported that she had quit her part-time job because it was stressful, but that she felt trapped because she could not work. Id. Davis also denied feeling depressed or anxious. Id. Dr. Handal then

25

gave his own assessment, which was that Davis was overall improved. Id.

The ALJ misread the record evidence in finding that Dr. Handal repeatedly assessed Davis's ability to function as "fair." Therefore, as far as the ALJ relied on this stated inconsistency in finding that Dr. Handal's opinion was not supported by the record, the ALJ's decision to give Dr. Handal's opinion "no weight" is not supported by substantial record evidence. The ALJ further found that Dr. Handal continued to give Davis a GAF of 50 even when his treatment notes revealed that he found she had improved, concluding that Dr. Handal's diagnosis was therefore unsupported by the record. However, as stated above, a GAF of 50 indicates either serious symptoms or serious impairments in social, occupational, or school functioning. Even when Dr. Handal assessed that Davis had shown improvement, his progress notes still contained evidence of Davis's serious impairments, and his diagnoses as to each of her impairments remained the same. See id. at 271-72. Moreover, just as Dr. Handal did not adjust Davis's diagnosis when she showed improvement, he did not adjust it when Davis's condition worsened, and Davis's condition routinely improved and worsened throughout the time she was seen by Dr. Handal. See id. at 271, 275, 277, 279, 281, 286, 296-97. Because Dr. Handal's diagnosis must be given considerable weight unless good cause is shown to the contrary, and since his diagnosis is not contradicted by contrary findings and

26

is consistent with his own assessments and progress notes, the substantial record evidence does not support the ALJ's decision to give Dr. Handal's medical opinion "no weight." See Phillips, 357 F.3d at 1240-41.

As to the ALJ's finding that Davis's treatment by Dr. Handal was sporadic, citing Dr. LaCour's statement on 6 December 2004 that Davis had not seen Dr. Handal in several months, the record evidence shows that Davis did not see Dr. Handal between 10 September 2004 and the 6 December 2004 statement by Dr. LaCour. However, the record also shows that in the three and one-half months between 20 May 2004 and 10 September 2004, Davis saw Dr. Handal on seven occasions. See id. at 271, 275, 277, 279, 281, 284. After 6 December 2004, Davis saw Dr. Handal on several more occasions. See id. at 296, 305, 307. The record therefore demonstrates that Davis underwent frequent treatment with Dr. Handal.

Furthermore, it should be noted that the ALJ gave "significant weight" to the opinion of the consulting psychologist, Ghostley. Id. at 19. That opinion stated, in part, "[m]emory for recent events was impaired . . . [j]udgment with regard to social functioning, family relationships, finances, employment, and future plans was poor." Id. at 217. He further found that "her ability to understand and remember instructions, as well as to respond appropriately to supervisors, co-workers, and work pressures in a work setting is impaired." Id. Dr. Ghostley also

27

found that a "favorable response to treatment is not expected within the next 6 to 12 months. As such, her prognosis is considered poor." Id. These findings, to which the ALJ gave significant weight, appear consistent with Dr. Handal's finding that Davis continued to have a GAF of 50, due to either serious symptoms or serious impairments in social, occupational, or school functioning.

Considering the longstanding relationship Davis had with Dr. LaCour, and the frequent treatment she underwent with Dr. Handal, as well as the facts that both Dr. LaCour's and Dr. Handal's medical opinions were bolstered by the evidence and that their medical records were overall consistent with their medical opinions, the ALJ's reasons for giving "no weight" to their opinions was not supported by substantial record evidence.

B.     Whether the ALJ erred by failing to properly consider Davis's subjective complaints and non-exertional impairments

On appeal, Davis argues that the ALJ failed to evaluate her pain under the three-part "pain standard." She asserts that the ALJ improperly discredited her subjective complaints of pain and did not consider whether her complaints stemmed from an underlying impairment that could reasonably be expected to produce such pain. Davis maintains that the ALJ's failure to properly evaluate her subjective complaints of pain led to his failure to give adequate consideration of the effect the exertional and non-exertional impairments had on her ability to work.

28

Further, Davis contends that the ALJ failed to adequately articulate his reasons for finding her testimony not credible, because he relied solely on her response to one question in the questionnaire to make that finding. Finally, Davis argues that, since the ALJ failed to properly consider her subjective pain and its underlying source, the first hypothetical question he posed to the VE severely minimized the effects of her depression, memory loss, and pain. She asserts that because of this minimization, the VE found that she could perform some light work. Under the second hypothetical posed to the VE, in which the ALJ described severe problems with concentration, pain, and the need for much rest, as Davis testified she experienced, the VE stated that a person experiencing such problems would not be able to function at any job on a sustained basis. Davis contends that had the ALJ properly considered her physicians' opinions and her own testimony regarding pain and memory problems, Davis would have established her disability under the second hypothetical posed to the VE.

A three-part "pain standard" applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. The pain standard requires "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or, (b) that the objectively determined medical condition can reasonably be

29

expected to give rise to the claimed pain. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam). A reversal is warranted if the ALJ's decision contains no evidence of the proper application of the three-part standard. See Holt v. Sullivan, 921 F.2d 1221, 1223-24 (11th Cir. 1991) (per curiam). "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so. Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995) (per curiam).

Where the ALJ improperly discredited claimant's subjective complaints, and thus failed to give adequate consideration to the effect the combination of claimant's exertional and non-exertional impairments had on her ability to work, the regulations require remand to the ALJ for reconsideration of claimant's residual functional capacity. Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990) (per curiam). When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications, and (5) treatment or measures taken by the claimant for relief of

30

symptoms. <u>See</u> 20 C.F.R. § 404.1529(c)(3)(i)-(iv).

In this case, the ALJ made specific reference to the pain standard, stating that he must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 404.1529, and Social Security Ruling 96-7p. R.Exhs. at 18. Further, the ALJ offered his reasoning as to why he found Davis not credible. <u>Id.</u> at 19. However, the reasons offered are not supported by substantial evidence in the record.

Here, the ALJ first determined that Davis's testimony of experiencing "such extreme limitations" was not credible because he found her statement in the daily activities questionnaire, that she could care for her personal needs, was inconsistent with her testimony given one year later, that her husband or child sometimes had to wash her hair. <u>Id.</u> at 19. The ALJ also found Davis's testimony inconsistent and not credible because of several progress notes completed after her onset date which demonstrated improvement in her condition. <u>Id.</u>

However, as noted above, the inconsistencies as reported by the ALJ are not supported by the record, and the ALJ must consider several factors when evaluating a claimant's subjective symptoms. <u>See</u> 20 C.F.R. § 404.1529(c)(3)(i)-(iv). Regarding Davis's daily activities, Davis testified that the main cause of her

inability to work is the pain she experiences. R.Exhs. at 321. She testified that her husband sometimes had to wash her hair because of the pain she experienced when she tried to do it herself. Id. at 324-25. She stated that she no longer cooks, unless she's having a particularly good day, that she sleeps often, and that her bad days outweighed her good. Id. at 323-28. She testified that the pain in her back, which travels down her legs, keeps her from sitting, crossing her legs, or standing for long periods of time. Id. at 322. On the questionnaire she completed on 6 April 2004, Davis stated that she had good days and bad days, and that the bad days prevented her from doing much more than lying in bed. Id. at 118. She stated that she sometimes cooks, and on a good day, she can perform light cleaning. Id. She stated that she no longer shops, pays the bills or balances the checkbook. She leaves the house only to go to the doctor, or to pick her daughter up from school. Id. at 118-20. Further, on a good day, she requires a break from any task after approximately a half-hour. Id. at 120. Accordingly, Davis's statements at the hearing were substantially the same as the answers she gave a year prior on the questionnaire, and the medical evidence supports those statements. Specifically, the medical evidence demonstrates that beginning in June 2003, Davis reported difficulty getting up from a seated position, because her hands, feet, and legs were aching. Id. at 176. By August 2003, Davis was only able to walk short distances.

32

Id. at 258. In September 2003, Davis had increased pain in her neck and shoulders, and, in December 2003, Davis was experiencing a tingling pain down the back of her right leg and was given a handicap tag. Id. at 209-10. In February 2004, Dr. LaCour found that Davis's fibromyalgia continued to have debilitating symptoms, and that if her symptoms did not improve, he would approve her disability. Id. at 205. Finally, that same month, and again in March, Davis's physical therapist noted that Davis was experiencing much pain in her neck and shoulders, and that the pain was increasing. Id. at 237-38. This medical evidence supports Davis's statements, both within the questionnaire and at the hearing, that she was experiencing great pain that kept her from being able to work.

As to the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms, Davis testified that she was diagnosed with fibromyalgia in June 2003. Id. at 315. She stated that she is unable to work because of the pain she suffers in her arms and legs, and the pain from her back that goes into her legs. Id. at 321-22. She stated that the pain in her legs is so sensitive that her physical therapist cannot touch it. Id. at 322. She stated that the pain keeps her from being able to sit for even an hour at a time. Id. at 323. Davis's medical records show that as to intensity, Davis frequently rated her pain between a six and a ten on a scale of one to ten. See id. at 236-37, 241, 244, 254-

55, 257, 259-60. Dr. LaCour's records show that over the nearly two years that he saw Davis, Davis repeatedly reported experiencing pain. On 14 different occasions, Dr. LaCour's progress notes mentioned Davis's pain, as well as his objective findings, noting, in part, "tenderness," "significant tenderness," "very symptomatic," "debilitating" and "pain all over." Id. at 213, 209, 208, 205, 301. As to aggravating factors, Davis's physical therapist assessed that her myofascial pain (painful musculoskeletal condition) was aggravated by her increased work. Id. at 239. Dr. LaCour assessed that Davis's fibromyalgia continued to "have significant tenderness since starting back to work." Id. at 210. His plan to address her pain was to release her from work for four weeks. Id. Regarding adverse side-effects from medications, Davis testified at her hearing that her medications caused severe memory problems and difficulty concentrating. Id. at 319. She stated in the questionnaire that she no longer performed certain household chores due to her inability to concentrate, and Davis's medical records show that she complained of memory and concentration problems to both Dr. Handal and Dr. LaCour. Id. at 211, 281, 291, 294. Dr. Handal recommended suspending her use of one medication in order to determine whether it was the cause of her memory problems. Id. at 282 Dr. Ghostley also noted Davis's memory problems. Id. at 217. Finally, regarding the measures taken by Davis to mitigate her symptoms,

34

Davis testified that she took medications, attended physical therapy, took baths, and had her husband stretch her. Id. at 319. The record evidence shows that Davis consistently visited Dr. LaCour and Dr. Handal, that she took the medications prescribed her and adjusted them as recommended by her doctors, and that she attended physical therapy sessions. Again, the record evidence supports the statements made by Davis both at her hearing and within the questionnaire she completed.

With this information as background, the ALJ had to consider the three-part "pain standard." Wilson, 284 F.3d 1225. As to the first prong, it is clear from the record, as the ALJ found, that Davis had underlying medical conditions. R.Exhs. at 17. The second prong requires either objective medical evidence that confirms the severity of the alleged pain arising from that condition, or that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. Wilson, 284 F.3d 1225. We have recognized that fibromyalgia can be disabling. See Phillips, 357 F.3d at 1243 (stating that fibromyalgia was a severe impairment that could limit a claimant's ability to perform unlimited types of work at the sedentary level). The Ninth Circuit has described fibromyalgia as a "rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other

35

tissue. Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." Benecke v. Barnhart, 379 F.3d 587, 589-90 (9th Cir. 2004).

Here, the record evidence, which consists of medical progress reports and physical therapist reports, Davis's subjective statements, and the assessments, objective findings, and recommendations of Davis's doctors, supports Davis's testimony as to her pain. The ALJ's reasons for discrediting Davis's testimony, that she was inconsistent and that progress notes demonstrated improvement in her conditions, are not supported by substantial evidence.

### III. CONCLUSION

We conclude that the ALJ's reasons for discrediting the opinions of Davis's treating physicians as well as Davis's testimony as to her pain are not supported by substantial evidence. Accordingly, we VACATE and REMAND for further considerations in accordance with our opinion.

**VACATED AND REMANDED.**